**AMBLING MANAGEMENT COMPANY, Plaintiff,**

v.

**UNIVERSITY VIEW PARTNERS, LLC, et al., Defendants.**

**Civil No. WDQ–07–2071.**

United States District Court, D. Maryland, Northern Division.

Oct. 8, 2008.

Linda S. Woolf, Joseph Benjamin Wolf, Thomas J.S. Waxter, III, Goodell Devries Leech and Dann LLP, Baltimore, MD, for Plaintiff.

Thomas M. Wood, IV, Neuberger Quinn Gielen Rubin and Gibber PA, Nathaniel Edmond Jones, Jr., James Howard Fields, Jones and Associates PC, Baltimore, MD, for Defendants.

MEMORANDUM OPINION

WILLIAM D. QUARLES, JR., District Judge.

Ambling Management Company ("Ambling") sued University View Partners, LLC ("UVP"), Otis Warren Management Company, Inc. ("OWMC"), and Otis Warren, Jr. ("Warren") (collectively the "Defendants") for breach of contract and tortious interference with contract. UVP counterclaimed for breach of contract, negligence, intentional misrepresentation, and unjust enrichment. Pending are (1) UVP's motion for summary judgment on Ambling's breach of contract claim (Count I) and Counts I through VI of its counterclaim; (2) Warren and OWMC's motion for summary judgment on Ambling's tortious interference with contract claim (Counts II and III); (3) Warren and OWMC's motion for leave to file excess pages; (4) Ambling's cross-motion for summary judgment on its breach of contract claim and UVP's counterclaims; and (5) Ambling's motion for leave to file a surreply. For the following reasons, UVP's motion for summary judgment will be denied, Warren and OWMC's motion for summary judgment will be granted, Warren and OWMC's motion for leave to file excess pages will be granted, Ambling's motion for summary judgment will be granted in part and denied in part, and Ambling's motion for leave to file a surreply will be denied.

I. Background

UVP owns University View Apartments ("University View"), an apartment building in College Park, Maryland that houses University of Maryland students. UVP's partners are Clark University View LLC (50 percent ownership), Warren (25 percent),[1] Stephen Garchik (17 percent), and

---

1. 20 percent of Warren's share is owned by Warren Family LLC, and .5 percent by University View Managing Member, Inc., both of which appear to be operated by Warren. Pl.'s Mot. S.J. Ex. C.

Stephen McBride (7.5 percent). Ambling is a property management company that specializes in student housing.

On April 13, 2004, UVP and Ambling entered into an agreement (the "Agreement") under which Ambling would manage University View and be its leasing agent until July 31, 2009. Warren was designated the Owner's Representative under the Agreement. James E. "Hugh" Hodge, Ambling's Senior Vice President of Student Housing, oversaw Ambling's operations under the Agreement, and delegated oversight to Julianne Sullivan and Deena Downey, Ambling's Regional Property Managers.

The Agreement provided that Ambling was to operate and maintain University View in a "first class manner."[2] Agreement at §§ 2.2, 3.1(a). The Agreement also required Ambling to employ capable staff to maintain and lease University View. *Id.* at § 3.2(a). If Ambling failed to comply with the Agreement and the default continued for fifteen days after UVP gave Ambling notice, UVP could terminate the Agreement. *Id.* at §§ 7.2(e),(g). UVP could terminate without notice if Ambling misappropriated funds, committed gross negligence, willful misconduct, fraud, malfeasance, or breached a fiduciary duty, and did not make restitution within five days and bar the responsible employee from University View. *Id.* at § 7.2(c).

University View's first year of operation was the 2005–2006 school year. Although utilities were included in the rent, UVP intended to include in leases a provision requiring a tenant to pay an extra fee if he used more utilities than allotted under the lease. This "utility cap" provision allowed UVP to recoup money spent when a tenant overused utilities. Through a drafting mistake,[3] the 2005–2006 leases listed utility caps that were "per-*tenant.*" However, the dollar caps listed were calculated per-*apartment.* As a result, individual tenants never exceeded the utility caps.[4] UVP did not recoup any extra money it spent on utilities.

When preparing the leases for the 2006–2007 school year, UVP sent Ambling a new utility cap provision that included a table in which dollar amounts were to be inserted. UVP asserts that it sent Ambling the provision only for review. Ambling added the provision to the new leases and retained the cap provision from the 2005–2006 leases in the leases signed by the tenants.[5] As a result, the new leases were confusing and potentially contradictory. Also, the table inserted into the leases did not include the cap amounts.

After discovering the problem, UVP asked Ambling to fix it. In August 2006, Downey prepared an addendum to the lease that provided substitute utility cap language. The 305 tenants who moved in

---

**2.** The Agreement defined "first class manner" as "the operation and management of [University View] in the same manner as is customary and usual in the operation of comparable student housing facilities consistent with the Annual Budget." Agreement at § 1.1.

**3.** The parties dispute who is at fault for the incorrect cap provision.

**4.** The utility cap was estimated use by an apartment of two to four people. The "per-

tenant" provision was applied to individuals rather than entire apartments; those individuals never used as much utilities as an entire apartment would have.

**5.** UVP states that Ambling gave the tenants the wrong version of the 2006–2007 lease before UVP could review it. Ambling states that it added the language, UVP approved the lease prior to submission to tenants, and then the old provision "made its way" into the new lease.

after the addendum was included signed it. However, UVP could not enforce the addendum on the 751 tenants who had previously moved in; UVP did not enforce the new addendum.

UVP also complained that Ambling did not hire and retain competent staff, including a full-time property manager. UVP alleges that Ambling's staff required constant supervision. UVP believes that Ambling's use of temporary employees led to constant turnover and an inefficient workplace. According to UVP, this led to unresponsiveness to tenants' concerns, and a deteriorating relationship with the University of Maryland and local law enforcement. In February 2005, Warren sent William Barkwell, Ambling's President, a letter stating his discontent with the appearance of the leasing office and the staff's ability to lead and handle applications.

On July 25, 2005, UVP notified Ambling that it had defaulted on various sections of the Agreement.[6] On July 29, 2005, Ambling and UVP met to discuss Ambling's alleged deficiencies. UVP continued to be dissatisfied with Ambling's performance and in August 2006, Warren sent Barkwell a letter notifying him that UVP had decided that Warren would manage University

View.[7] On September 11, 2006, Barkwell sent a letter to Warren stating that Ambling had not defaulted, and it expected to continue its performance under the Agreement. On September 13, 2006, UVP notified Ambling that it had defaulted and UVP was terminating the Agreement, effective October 15, 2006.

On August 3, 2007, Ambling sued UVP for breach of contract and OWMC and Warren for tortious interference with contract. On August 29, 2007, UVP counterclaimed, alleging breach of contract,[8] negligence, intentional misrepresentation, and unjust enrichment. On December 19, 2007, Ambling increased its ad damnum.

On August 8, 2008, UVP moved for summary judgment on Ambling's breach of contract claims and Counts I through VI of its counterclaim.[9] On the same day, Warren and OWMC moved for summary judgment on Ambling's tortious interference with contract claims. Warren and OWMC subsequently moved for leave to file excess pages.[10] On August 31, 2008, Ambling moved for summary judgment on its breach of contract claim and UVP's counterclaims. On September 3, 2008, Ambling moved for leave to file a surreply to the Defendants' motion for summary judgment.

---

6. UVP asserted that Ambling was in default of Sections 2.2 (operate the property in a first class manner), 3.1 (manage the property in a first class manner), 3.2 (employ competent staff) and 3.3 (enforce rent obligations of tenants) of the Agreement. Def.'s Mot. S.J. Ex. 10.

7. Warren would manage University View through his management company, OWMC.

8. UVP alleged six counts of breach of contract.

9. UVP did not file its own memorandum but incorporated Warren and OWMC's memoran-

da in support of its motion for summary judgment.

10. Warren and OWMC's motion for summary judgment was 108 pages, 58 more than the Local Rules permit. Local Rule 105.3. Much of the brief is occupied by unnecessary and repetitive block quotes and deposition testimony. OWMC and Warren did not move for leave to file excess pages until nearly two weeks after filing its brief. Even though the motion was untimely and the Court could have denied summary judgment because of the excess pages, the Court will—this time— grant the motion for leave.

## II. Analysis

### A. Ambling's Claims

#### 1. Standard of Review

Under Rule 56(c), summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court must view the facts and reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)). The opposing party, however, must produce evidence upon which a reasonable factfinder could rely. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A mere "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

#### 2. Breach of Contract

UVP argues that its termination did not breach the Agreement because Ambling defaulted by committing gross negligence and malfeasance, and failing to manage and maintain University View in a first class manner. Ambling counters that (1) UVP breached by not providing proper notice under the Agreement, (2) its actions did not constitute gross negligence or malfeasance, and (3) UVP cannot claim gross negligence or malfeasance because its termination notice did not mention those acts. UVP replies that (1) Ambling had actual notice, (2) Ambling, being in breach of the Agreement, cannot recover for UVP's breach, (3) the July 2005 letter was sufficient notice, and (4) the provision relating to gross negligence does not require notice.

 In Maryland, the interpretation of a contract is a question of law, and courts interpret contracts objectively. *Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448, 952 A.2d 275, 283 (2008). The Court seeks to ascertain the parties' intent. *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.,* 167 Md.App. 327, 391, 892 A.2d 1185, 1223 (Md.Spec.App.2006). If a contract is unambiguous, the Court gives effect to the terms' plain meaning, not what the parties subjectively intended. *Nova Research, Inc.,* 405 Md. at 448, 952 A.2d at 283. "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Id.* "A contract is not ambiguous merely because the parties do not agree as to its meaning." *Floyd v. Mayor of Baltimore,* 179 Md.App. 394, 451, 946 A.2d 15, 48 (Md. Spec.App.2008).

 To determine whether contract language is susceptible to more than one meaning, the Court can consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id.,* 946 A.2d at 48–49. The Court considers "the customary, ordinary and accepted meaning of the language used." *Nova Research, Inc.,* 405 Md. at 448, 952 A.2d at 283 (*quoting Atl. v. Ulico,* 380 Md. 285, 301, 844 A.2d 460, 469 (2004)). Whether a contract is ambiguous is itself a question of law for the Court. *Essex Corp. v. Susan Katharine Tate Burrowbridge, LLC,* 178 Md.App. 17, 32, 940 A.2d 199, 207 (Md.Spec.App.2008). If the contract is unambiguous, and there is no dispute of fact, summary judgment is

proper. *Bollech v. Charles County, Maryland,* 166 F.Supp.2d 443, 455 (D.Md.2001).

■ If there is ambiguity, the Court reviews extrinsic evidence to determine the parties' intent, including dictionaries, the history of the parties' negotiations, the parties' conduct and an interpretation of the term used by one of the parties before the dispute arose. *Holland v. Psychological Assessment Res., Inc.,* 482 F.Supp.2d 667, 673–74 (D.Md.2007); *Ohio Cas. Ins. Co. v. Chamberlin,* 172 Md.App. 229, 241, 914 A.2d 160, 167 (Md.Spec.App.2007). If extrinsic evidence is dispositive of the term's meaning, the Court may grant summary judgment. *Holland,* 482 F.Supp.2d at 674. However, if after resorting to extrinsic evidence there is a genuine dispute with respect to interpretation, summary judgment is improper and the trier of fact decides the proper interpretation. *Id.; see Bd. of Educ. of Charles County v. Plymouth Rubber Co.,* 82 Md.App. 9, 26, 569 A.2d 1288, 1296 (Md.Spec.App.1990) ("Only when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application ... is the contract submitted to the trier of fact for interpretation.").

### a. Gross Negligence or Malfeasance

Section 7.2(c) of the Agreement provides that UVP can terminate if Ambling commits "gross negligence, willful misconduct, fraud, malfeasance or breach of fiduciary duty," does not make restitution within five days of discovery, and does not bar the responsible employee from the property or make other satisfactory arrangements. Ambling concedes that the Agreement does not require notice before termination for acts under this section. Pl.'s Mot. S.J. at 25; *see* Agreement at § 7.2(c).

As a preliminary matter, Ambling argues that UVP cannot rely on Ambling's alleged negligence with respect to the utility caps provision because it was not UVP's reason for terminating the Agreement. To the contrary, Warren testified that one of his reasons for deciding to terminate Ambling was that the lease was "not operating." Otis Warren, Jr. Dep. 351:20–353:2, May 7, 2008. It is clear that Warren is referring to the utility caps provision. In a September 14, 2006, letter—the day after Warren notified Ambling of its termination—Warren wrote Barkwell a letter about the utility provision error. Def.'s Mot. S.J. Ex. 21. Also, Ambling admits that prior to the 2006–2007 school year, Warren told Downey about the error in the lease and asked her to fix it. Pl.'s Mot S.J. at 11. Thus, Ambling knew of the utility provision error, and UVP can rely on it.

■ "Gross negligence" and "malfeasance" are not defined in the Agreement. These terms are ambiguous and open to multiple reasonable interpretations. Therefore, the Court will consult extrinsic evidence to ascertain the parties' intent. Maryland courts define gross negligence as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." *Barbre v. Pope,* 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (*quoting Liscombe v. Potomac Edison Co.,* 303 Md. 619, 635, 495 A.2d 838, 846 (1985)). Gross negligence is more than simple negligence and "more akin to reckless conduct." *Id.* (*quoting Taylor v. Harford County Dep't of Soc. Servs.,* 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004)). Maryland courts have cited Webster's International Dictionary when defining malfeasance as evil conduct or an illegal deed. *Chester v. State,* 32 Md.App. 593, 603, 363 A.2d 605, 611 (Md. Spec.App.1976).

The context in which the terms appear in the Agreement is also helpful to their interpretation. In addition to gross negli-

gence and malfeasance, Section 7.2(c) applies to willful misconduct,[11] fraud, breach of fiduciary duty, and the misappropriation of funds, all of which focus on purposeful bad acts. Thus, the common definitions of gross negligence and malfeasance and their context in the Agreement suggest that the parties contemplated conscious conduct that highly disregarded UVP's rights.

On the other hand, UVP argues that the parties intended gross negligence and malfeasance to denote a lesser standard. UVP points to Barkwell's deposition, in which he stated that he understood gross negligence to mean that Ambling would not manage the property at the level at which it was supposed to perform, and would not have brought in revenue at or near budget, or done anything to cause loss to the property. William Barkwell Dep. 102:17–103:16, Apr. 30, 2008. Barkwell's understanding at the time of the Agreement was that "malfeasance" meant taking money from the property or doing anything in breach of Ambling's fiduciary duties. *Id.* at 103:17–104:6. In a subsequent affidavit, though, Barkwell stated that "gross negligence" and "malfeasance" were never discussed or negotiated, and his intent was that they retain their normal meanings. William Barkwell Aff. ¶ 7, July 29, 2008.

Under either the common definition or Barkwell's understanding of malfeasance, Ambling's alleged mistake with regard to the utility provision would not constitute malfeasance. If anything, Ambling made a mistake; its actions were not purposeful. However, there is conflicting evidence of the meaning of gross negligence. If gross negligence meant what Barkwell originally said it meant—that

Ambling was not to cause loss to UVP— Ambling may have been grossly negligent. Under the common definition, however, Ambling's conduct would not have been grossly negligent because its conduct was not reckless, much less purposeful. There is a bona fide dispute as to the meaning of gross negligence as it was used in the Agreement, and thus the Court cannot hold as a matter of law that Ambling breached the Agreement.

### b. "First Class Manner" and Other Breaches

UVP argues that it did not breach by terminating the Agreement because Ambling was in default for not operating University View in a "first class manner." Specifically, UVP contends that Ambling was in default because it failed to (1) employ competent staff, (2) provide an organized work environment, (3) maintain a full-time property manager, (4) provide maintenance, (5) maintain positive relationships with the University of Maryland and law enforcement, and (6) enforce the rent obligations of tenants. Ambling counters that UVP breached the Agreement by terminating Ambling without proper notice.

#### i. Notice

Section 7.2(e) of the Agreement provides that UVP can terminate if Ambling breaches a material obligation and the default continues for 15 days after notice from UVP. Section 7.2(g) provides that UVP can terminate Ambling for any nonmaterial breach if the breach continues for 15 days after UVP gives notice and the default is continuing. The Agreement does not specify what must be included in a notice under Section 7.2, but only to

---

**11.** Willful misconduct has been defined as conduct "performed with the actor's actual knowledge or with what the law deems the equivalent of actual knowledge of peril ... coupled with a conscious failure to avert injury." *Griffith v. Southland Corp.,* 94 Md.App. 242, 259, 617 A.2d 598, 606 (Md. Spec.App.1992).

whom it must be sent and through what medium. *See* Agreement at § 8.1.

■ Notwithstanding, Ambling argues that UVP's July 25, 2005, notice was insufficient because it lacked specificity. The letter lists the Agreement provisions that UVP believed Ambling breached, and references the communications Warren had with Ambling's personnel regarding those breaches. *See* Pl.'s Mot. S.J. Ex. K. On July 25, 2005, the same day UVP sent Ambling notice, Warren sent Barkwell an email expressing UVP's concerns with Ambling's staff. Def.'s Rep. Ex. C. Those same concerns, along with others, were discussed at the meeting between UVP and Ambling on July 29, 2005. *Id.* at Ex. E. Ambling had actual notice of UVP's complaints, and UVP's failure to detail its concerns in the July 25, 2005, letter is not fatal because it was not required by the Agreement. *See B & P Enters. v. Overland Equip. Co.*, 133 Md.App. 583, 612–13, 758 A.2d 1026, 1041 (Ct.Spec.App.2000) (lessee's failure to follow lease provision requiring notice of default does not preclude his recovery under the lease when lessor had actual knowledge of lessee's complaints).[12]

■ Ambling also argues that UVP cannot rely on its July 2005 letter as notice for termination in September 2006, more than one year later. This argument is without merit, however, as the evidence shows that UVP's complaints about Ambling's performance continued throughout 2006 until Ambling's termination. Indeed, Ambling stated that it had four different

property managers at University View from July 2005 to September 2006. Def.'s Rep. Ex. I, at 7–8. Thus, UVP did not breach the Agreement's notice provision.

### ii. Breach

UVP's July 2005 letter—that it claimed was the basis for Ambling's termination—stated that Ambling had breached Sections 2.2, 3.1, 3.2(a), and 3.3(b) of the Agreement. Sections 2.2 and 3.1 require Ambling to manage University View in a "first class manner." Section 3.2(a) requires Ambling to employ "capable personnel." Section 3.3(b) requires Ambling to administer the provisions of leases, ensure that tenants receive the services required under the leases, and enforce and preserve the rights of UVP and obligations of tenants under the leases.

■ There is no genuine dispute that University View lacked proper management and staff during Ambling's tenure as manager. The record shows frequent turnover and complaints from UVP about the staff. However, there is a dispute as to whether Warren, or Ambling, was the reason for constant turnover. A party to a contract cannot engage in conduct that prevents the other party from performing, and then use that as an excuse for not performing. *David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 461, 914 A.2d 136, 147 (2007); *7–Eleven, Inc. v. McEvoy*, 300 F.Supp.2d 352, 360 (D.Md.2004); *Eaglehead Corp. v. Cambridge Capital Group, Inc.*, 170 F.Supp.2d 552, 562 (D.Md.2001).

---

**12.** Ambling's reliance on *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257 (4th Cir.1981), is inapposite. In *Hubler Rentals*, the Fourth Circuit, interpreting Maryland law, held that a party's letters to another party informing it of its defaults under their contract was insufficient to satisfy the contract's default notice provisions. *Id.* at 259–60. The contract required the party giving notice to specify "with substantiating evi-

dence the nature, time, place, circumstances and all other available information relevant to the breach." *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 459 F.Supp. 564, 588 (D.Md.1978). The Fourth Circuit and the district court based their decisions on the requirements of that notice provision. *Id.* at 591–92; *Hubler Rentals*, 637 F.2d at 259–60. Since the Agreement here did not contain such a provision, *Hubler* does not apply.

Cyn Trombley, a one-time property manager at University View, sent Downey a resignation email in which she stated that Downey and Ambling were the reason she quit. Def.'s Rep. Ex. J. Dennis Jenkins, a maintenance employee at University View, testified that several Ambling staff members were incompetent, and that Downey was disorganized and inefficient. Dennis Jenkins Dep. 148:18–152:13, Jan. 22, 2008. On the other hand, Ambling has provided evidence that Warren was responsible for driving away Ambling employees and that he rejected potential applicants. James Hodge Dep. 395:3–400:20, Apr. 9, 2008; Deena Downey Dep. 113:16–115:12, Feb. 26, 2008. Thus, there is a genuine dispute about who is at fault for Ambling's inability to employ capable staff.

There is also a genuine dispute as to which party is responsible for the erroneous utility cap provisions. Francine Churchill, on behalf of Warren, sent Ambling representatives a proposed utility provision that included the terms "per tenant," Pl.'s Mot S.J. Ex. R., the same terms UVP complains were in the lease. There is also evidence that UVP sent the utility cap language for the 2006–2007 lease without including the actual dollar amounts. Warren Dep. 236–237. On the other hand, the old version of the utilities cap provision "made its way" into the 2006–2007 lease, Pl.'s Opp. at 11, making it confusing for tenants and potentially unenforceable by UVP. This was likely Ambling's fault because it administered the leases and was in the best position to catch the error. Also, Barkwell testified that it was Ambling's responsibility to ascertain whether the utilities provision allowed UVP to recover any costs.[13] Barkwell Dep. 97:19–98:21.

Section 3.3(b) of the Agreement required Ambling to "administer" the provisions of the leases, which presumptively imposed at least a minimal duty on Ambling to review the leases before providing them to tenants. But there is a factual dispute about the circumstances leading to (1) the "per tenant" language being used, (2) the utility cap table lacking dollar amounts, and (3) the 2005–2006 lease language improperly remaining in the 2006–2007 leases. It is unclear to what extent UVP's acts caused these errors. *See David A. Bramble, Inc.*, 396 Md. at 461, 914 A.2d at 147. As a result, summary judgment will be denied on Count I.

### 3. Tortious Interference with Contract

 In Maryland, tortious interference with contract requires (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract; (4) breach of the contract by a third party; and (5) damages. *Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons*, 358 F.Supp.2d 475, 480 (D.Md.2005).

### a. Against Warren

Warren and OWMC argue that Ambling's claim for tortious interference against Warren fails because (1) he did not act outside the scope of his employment, (2) he did not act wrongfully or for his own benefit, (3) he did not intend that UVP would breach the Agreement, (4) he did not cause UVP's breach of the Agreement, and (5) UVP did not breach the Agreement. Ambling counters that Warren disrupted Ambling's performance of the Agreement and lobbied UVP to terminate the Agreement, and Warren was not acting within the scope of his employment.

 A claim for tortious interference with contract cannot lie against a party to the contract. *Kaser v. Fin. Protection Mktg., Inc.*, 376 Md. 621, 630, 831

---

**13.** Though, Barkwell stated, that was Hugh Hodge's area of knowledge.

A.2d 49, 54 (2003); *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 89 (1992). This applies equally to an employee of a party to a contract. *Pope v. Board of School Comm'rs of Baltimore City*, 106 Md.App. 578, 592, 665 A.2d 713, 719 (Md. Spec.App.1995). "[W]hen an employee acts within the scope of her employment, or as an agent for her employer, she cannot be held liable for interfering with the contract." *Id.* (quoting *Bleich v. Florence Crittenton Serv.*, 98 Md.App. 123, 147, 632 A.2d 463 (Md.Spec.App.1993)); *see Hejirika v. Maryland Div. of Corr.*, 264 F.Supp.2d 341, 347 (D.Md.2003).

 The plaintiff must prove that the employee acted "maliciously for his own motives and beyond the scope of his authority without the intent to further the interests of the employer." *Pope*, 106 Md. App. at 591–92, 665 A.2d at 713; *Hejirika*, 264 F.Supp.2d at 347. When the plaintiff has not provided evidence that the employee was acting outside the scope of employment, summary judgment is proper. *See Beall v. Abbott Labs.*, 130 F.3d 614, 621 (4th Cir.1997), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Simon v. Union Hosp. of Cecil County, Inc.*, 15 F.Supp.2d 787, 799 (D.Md. 1998), *aff'd on other grounds* and *rev'd on other grounds*, No. 98–2138, 1999 WL 957744 (4th Cir. Oct.20, 1999).

 Warren is a partner of UVP and is its representative under the Agreement. Def.'s Mot. Ex. 1, § 2.8. In that capacity, Warren frequently visited University View, interacted with Ambling personnel, and reported his observations to UVP. Otis

Warren, Jr. Aff., ¶ 5, July 8, 2008. Warren testified that at all times he acted in UVP's best interests. *Id.* at ¶ 6.

Ambling argues that there is "substantial compelling evidence" that Warren acted in his own interests. Pl.'s Mot. S.J. at 43. Ambling makes unsupported allegations that Warren ruined Ambling and UVP's relationship and secured the contract for OWMC, even though he had no experience managing student properties and did not interview other companies for the job. To the contrary, Warren met with at least two management companies about the position and contacted others. Otis Warren, Jr. Dep. 366:6–370:20, May 7, 2008. Warren ultimately chose to do the job himself because he was familiar with University View's problems. *Id.* at 370:21–371:11. Although Warren had no experience in student housing, he had managed properties for 40 years and was managing at least three properties when OWMC began managing University View. *Id.* at 39:11–40:21.

The Defendants provided evidence that Ambling performed its duties at an unsatisfactory level, including failing to (1) have competent staff and a full-time property manager, (2) properly maintain the building, (3) monitor building safety, and (4) enforce the tenants' rent obligations. Def.'s Mot. S.J. Ex. 5 at 4–9. This shows that Warren and UVP terminated the contract with Ambling for valid purposes and in UVP's best interest.[14] Accordingly, Ambling has not shown that Warren acted outside the scope of his employment, and Warren is entitled to summary judgment.

---

**14.** Ambling cites *Dobkin v. Johns Hopkins Univ.*, No. 93–2228, 1994 WL 146760 (D.Md. Jan.25, 1994), for support that summary judgment is improper. The *Dobkin* court refused to dismiss claims of tortious interference against employees of the defendant because the plaintiff alleged that the employees acted out of personal motive. *Id.* at *10. *Dobkin* is inapposite because it dealt with a motion to dismiss, at which stage the plaintiff did not need to provide evidence. To defeat summary judgment, Ambling must provide evidence of Warren's intent.

### b. Against OWMC

Warren and OWMC argue that OWMC is entitled to summary judgment because Ambling has not provided any evidence that Warren was acting on behalf of OWMC when he terminated the Agreement or an agent of OWMC did anything to interfere with the Agreement, and UVP did not breach the Agreement. Ambling responds that OWMC played a critical role in UVP's terminating the Agreement, and Warren and OWMC acted in their own interests when terminating the Agreement.[15]

■■■ Warren owns and operates OWMC, and Ambling does not assert that anyone except Warren interfered with the Agreement. An employer cannot be liable under respondeat superior when its employee that is alleged to have committed the tort is not liable. *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 488, 836 A.2d 627, 643 (2003). Since Warren did not tortiously interfere, OWMC cannot be vicariously liable and is entitled to summary judgment.

### B. UVP's Counterclaim

UVP has moved for summary judgment on Counts I through VI of its counterclaim. In response, Ambling moved for summary judgment on all nine counts of UVP's counterclaim.

### 1. First Class Manner

In Counts I and II, UVP asserts that Ambling breached Sections 2.2 and 3.1 of the Agreement by not maintaining University View in a "first class manner." UVP moved for summary judgment on these Counts, and in response Ambling moved for summary judgment arguing that UVP cannot show damages. UVP counters that it suffered damages because Ambling gave tenants leases that contained incorrect utility cap provisions, and that failure to provide quality staff allowed vandalism to University View and UVP incurred the costs.

■■■ In a breach of contract action, the plaintiff need not prove damages resulting from the breach. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co., Inc.*, 271 Md. 565, 572, 318 A.2d 514, 518 (1974). A plaintiff may recover nominal damages, even though he has not shown actual damages. *Taylor*, 365 Md. at 175, 776 A.2d at 651. Thus, UVP does not need to show damages to succeed on its counterclaim.

Counts I and II are based largely on the incorrect utility caps provision and allegations of incapable staff. As stated above, there is a factual dispute about whether UVP contributed to these errors through its oversight in drafting the provision and Warren's involvement with the staff. Therefore, summary judgment will be denied on Counts I and II.

### 2. Capable Personnel

■■■ Count III of UVP's counterclaim alleges that Ambling breached Section 3.2 of the Agreement by not employing and maintaining a "sufficient staff of capable personnel for the proper maintenance, leasing, and operation of the Premises." Because there is a factual dispute as to whether Warren's interference caused Ambling to not employ capable staff, summary judgment on Count III will be denied.

### 3. Enforce the Rights of UVP and Obligations of Tenants

Count IV of the counterclaim alleges that Ambling breached Section 3.3(b) of the Agreement by not enforcing UVP's

---

**15.** Ambling covers Warren and OWMC in its sole argument in opposition to summary judgment on the tortious interference claim. *See* Pl.'s Mot. S.J. at 40 n. 20.

rights and the obligations of tenants under the leases. UVP moved for summary judgment on Count IV. Ambling counters that it is entitled to summary judgment because its rent collection efforts exceeded UVP's expectations and industry standards. UVP responds that Ambling can be delinquent in rent collection efforts and still meet budget expectations, and Ambling was deficient because of the utility caps provision.

■ Section 3.3(b) requires Ambling to administer the provisions of the leases and enforce UVP's rights and the tenants' obligations under the leases. Section 3.3 does not say anything about Ambling acting in a first class manner, or what percentage of rents Ambling must collect.[16] UVP provided evidence that Ambling was not actively pursuing rent deficiencies in court. Francine Churchill Dep. 210:4–212:19, Feb. 8, 2008; Def.'s Opp. Ex. W (March 2006 email from Warren to Hodge). Although Ambling's evidence may show that it did a good job collecting rents, the Agreement dictates only that Ambling must enforce the tenants' obligations. That said, UVP's only evidence of rent delinquencies is an email in which Warren expresses concern about delinquencies and Francince Churchill's vague testimony that rents were delinquent. Also, as stated above, the record is unclear on the utility cap issue. Thus, summary judgment will be denied.[17]

### 4. Utility Cap Provision

In Count V of its counterclaim, UVP alleges that Ambling breached Section 2.2 of the Agreement by failing to properly draft a lease provision allowing UVP to recoup a portion of the utility costs. Ambling responds that Section 2.2 pertains to managing University View in a first class manner, and has nothing to do with drafting a lease provision.[18] Because UVP is seeking the same relief for the same alleged violation in Count IV of its counterclaim, the Court will grant summary judgment on Count V because Section 2.2 is a general statement of Ambling's duties while Section 3.3 specifically deals with lease obligations.

### 5. Negligence

Count VI of UVP's counterclaim alleges that Ambling was negligent in its duty under Section 2.2 of the Agreement to provide all services necessary for operation in a first class manner because it did not properly implement a utility recoupment provision.[19] Ambling counters that (1) Section 2.2 does not apply to lease drafting, (2) it was UVP's fault that the utility cap language was incorrect, (3) UVP had no intent to collect utility overages, and (4) if Ambling is liable, UVP's damages are a fraction of what it seeks.

■ Section 2.2 states that Ambling must operate University View in a first

---

**16.** Although Section 3.1 provides that Ambling generally must maintain University View in a "first class manner," Section 3.3(b) specifically discusses the lease obligations of tenants, and the specific provision controls. *Heist v. E. Sav. Bank, FSB*, 165 Md.App. 144, 151, 884 A.2d 1224, 1228 (Md. Spec.App.2005).

**17.** Interestingly, UVP sought summary judgment on Count IV, but later argued that there is a dispute of fact precluding summary judgment on that Count. *See* Def.'s Opp. at 31.

**18.** UVP moved for summary judgment on Count V but did not argue for it in its brief. After Ambling filed its motion for summary judgment on Count V, UVP did not oppose it.

**19.** UVP cited Section 2.1 in its negligence claim, which states only that Ambling is an independent contractor and has leasing duties under the Agreement. The Court assumes that UVP meant Section 2.2, which provides that Ambling must operate University View in a first class manner.

class manner, "including the duties and services specified in [the] Agreement." Section 2.2 arguably is broad enough to apply to the utility caps issue, though other provisions in the Agreement are more applicable. As stated above, there is a factual dispute about the circumstances leading to the errors in the leases. Also, the Court is not persuaded that UVP did not intend to recapture utility overages from tenants, considering the discussions it had with Ambling and efforts it made to implement the provision. Therefore, summary judgment will be denied.

### 6. Improper Payments

In Counts VII, VIII and IX, UVP claims breach of contract, misrepresentation, and unjust enrichment. UVP argues that Ambling accepted higher bids from companies to perform services for University View, accepted payment from the companies in return, and passed on the costs to UVP. Ambling argues that UVP has provided no evidence showing the improper kickbacks.[20]

 The only evidence UVP has provided in support of its claims is its answer to Ambling's interrogatories. UVP stated that "upon information and belief, Ambling received improper rebates from various companies ... including ... various hardware and light companies, Wilmar Industries, Hughes Supply, Inc., Sherwin Williams Co., and Allsouth Painting and Wallcovering, Inc." Def.'s Mot. S.J. Ex. 5 at 12. For interrogatory answers to be considered on summary judgment, they must satisfy the personal knowledge requirement of Federal Rule of Civil Procedure 56(e). *Solis v. Prince George's County*, 153 F.Supp.2d 793, 799 (D.Md.2001); *Planmatics, Inc. v. Showers*, 137 F.Supp.2d 616, 621–22 (D.Md.2001).

UVP's interrogatory is based only on information and belief. Testimony by Warren and Dennis Jenkins reveals no personal knowledge of Ambling taking kickbacks. Warren Dep. 362–364; Dennis Jenkins Dep. 168:4–174:10, Jan. 22, 2008. To survive summary judgment, the nonmovant must provide facts showing a genuine issue for trial. *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir.2008). UVP has not provided any evidence that Ambling received kickbacks, and therefore summary judgment will be granted.[21]

### III. Conclusion

For the reasons discussed above, UVP's motion for summary judgment will be denied, Warren and OWMC's motion for summary judgment will be granted, Warren and OWMC's motion for leave to file excess pages will be granted, Ambling's motion for summary judgment will be granted in part and denied in part, and Ambling's motion for leave to file a surreply will be denied.

### ORDER

For the reasons discussed in the accompanying Memorandum Opinion, it is, this 8th day of October, 2008, ORDERED that:

1. University View Partners, LLC's motion for summary judgment (Paper No. 36) BE, and HEREBY IS, DENIED;

2. Otis Warren, Jr. and Otis Warren Management Company, Inc.'s motion for summary judgment (Paper No. 42) BE, and HEREBY IS, GRANTED;

 a. Judgment BE, and HEREBY IS, GRANTED to Otis Warren Management Company on Ambling Management Company's tortious interference with contract claim (Count II);

---

20. UVP did not respond to Ambling's arguments.

21. The Court does not see the need for a surreply; thus, Ambling's motion will be denied.

b. Judgment BE, and HEREBY IS, GRANTED to Otis Warren, Jr. on Ambling Management Company's tortious interference with contract claim (Count III);

3. Otis Warren and Otis Warren Management Company, Inc's motion for leave to file excess pages (Paper No. 43) BE, and HEREBY IS, GRANTED;

4. Ambling Management Company's motion for summary judgment (Paper No. 45) BE, and HEREBY IS, GRANTED IN PART and DENIED IN PART;

a. Judgment on Ambling's breach of contract claim (Count I) and Counts I, II, III, IV and VI of University View Partners, LLC's counterclaim BE, and HEREBY IS, DENIED;

b. Judgment on Counts V, VII, VIII and IX of University View Partners, LLC's counterclaim BE, and HEREBY IS, GRANTED;

5. Ambling Management Company's motion for leave to file a surreply (Paper No. 57) BE, and HEREBY IS, DENIED; and

6. The Clerk of the Court shall send copies of this Memorandum Opinion and Order to counsel for the parties.